1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    UNITED STATES OF AMERICA,              No.  1:13-cr-00420-NONE

12                    Plaintiff,

13          v.                                ORDER DENYING DEFENDANT'S
                                              MOTION FOR COMPASSIONATE
14    ELIEZAR AGUILAR-MADRIZ,                 RELEASE

15                    Defendant.              (Doc. No. 117)

16

17

18          Pending before the court is defendant Eliezar Aguilar-Madriz's motion for compassionate

19   release pursuant to 18 U.S.C. § 3582(c)(1)(A).  The motion is largely based on defendant's

20   medical condition and the risks allegedly posed to him by the ongoing coronavirus ("COVID-

21   19") pandemic.  (Doc. No. 117.)  For the reasons explained below, defendant's motion will be

22   denied.

23                              **BACKGROUND**

24          On February 28, 2014, defendant Aguilar-Madriz was charged by way of a superseding

25   indictment in six counts:  conspiracy to distribute 500 grams or more of a mixture or substance

26   containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 846 and

27   841(a)(1) (Count One); distribution of 500 grams or more of a mixture or substance containing a

28   detectable amount of methamphetamine and aiding and abetting in violation of 21 U.S.C. §

1

1    841(a)(1) and 18 U.S.C. § 2 (Count Two); use of a minor in committing a drug trafficking

2    offense, distribution of 500 grams or more of a mixture or substance containing a detectable

3    amount of methamphetamine, heroin, and marijuana, and aiding and abetting in violation of 21

4    U.S.C. §§ 841(a)(1), 861(a)(1), and 18 U.S.C. § 2 (Counts Three and Four); and possession with

5    the intent to distribute 500 grams or more of a mixture or substance containing a detectable

6    amount of methamphetamine and marijuana and aiding and abetting, in violation of 21 U.S.C.

7    §§ 841(a)(1), (b)(1)(A), and 18 U.S.C. § 2 (Counts Five and Six).  (Doc. No. 35.)  On March 30,

8    2015, pursuant to the parties' plea agreement, defendant entered a plea of guilty to Count Three

9    of the superseding indictment.  (Doc. Nos. 64 at 2; 70.)

10          The presentence report prepared in defendant's case summarized his offense conduct,

11    reporting that between January and November 2013, defendant supplied various amounts of

12    methamphetamine on several occasions and heroin on one occasion to undercover agents.  (Doc.

13    No. 77 (Presentence Report) at 5–6.)  Defendant was found to be responsible for the sale of 3.9

14    kilograms of methamphetamine and 25.4 grams of heroin.  (*Id.* at 7.)  In addition, defendant used

15    his minor son to count the money received following one of the illegal drug transactions.  (*Id.* at

16    5, 14.)  It was ultimately determined that under the advisory U.S. Sentencing Guidelines

17    defendant Aguilar-Madriz's adjusted offense level was 33 and his criminal history placed him in

18    category I, resulting in an advisory sentencing guideline range calling for a term of imprisonment

19    of between 135 and 168 months.[1]  (*Id.* at 14.)  The U.S. Probation Office recommended that a

20    sentence of 135 months be imposed.  (*Id.*)  Defendant's counsel argued for a sentence of not more

21    than 120 months.  (Doc. No. 88 at 3.)  On June 29, 2015, the sentencing judge varied downward

22    from the advisory guideline range and  sentenced defendant to 120 months in prison and imposed

23    the $100 mandatory special

24    _____

25    [1]  Defendant was found to be "safety valve" eligible in part because he was not a leader in
      committing his offense and he did not have any prior criminal convictions.  (Doc. No. 77

26    (Presentence Report) at 7, 14.)  Thus, the sentencing court was not required to impose the
      mandatory minimum sentence of 10 years, although the presentence report noted the presence of

27    aggravating factors, such as defendant's involvement of his minor son in the offense conduct,
      which in the probation officer's view supported a sentence within the advisory guideline range,

28    nonetheless. (*Id.* at 14.)

1    assessment.  (Doc. Nos. 89; 90 at 2–3.)  No term of supervised release was imposed in light of the

2    defendant's near certain deportation following the service of his sentence.

3            Defendant is currently serving his sentence at the Big Spring Correctional Institution

4    located in Big Spring, Texas ("CI Big Spring"), a U.S. Bureau of Prisons' ("BOP") private,

5    contract facility, with a projected release date of June 25, 2022.  *See Find an inmate*, FEDERAL

6    BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Jan. 5, 2021.)  On November

7    23, 2020, defendant filed the pending motion for compassionate release pursuant to 18 U.S.C.

8    § 3582(c)(1)(A).  (Doc. No. 117.)  On December 14, 2020, the government filed its opposition to

9    the motion, and on December 21, 2021, defendant filed his reply thereto.  (Doc. Nos. 123, 129.)

10                                            **LEGAL STANDARD**

11           A court generally "may not modify a term of imprisonment once it has been imposed."  18

12   U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of

13   conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not

14   be modified by a district court except in limited circumstances.").  Those limited circumstances

15   include compassionate release in extraordinary cases.  *See United States v. Holden*, 452 F. Supp.

16   3d 964, 968 (D. Or. 2020).  Prior to the enactment of the First Step Act of 2018 ("the FSA"),

17   motions for compassionate release could only be filed by the BOP.  18 U.S.C. § 3582(c)(1)(A)

18   (2002).  Under the FSA, however, imprisoned defendants may now bring their own motions for

19   compassionate release in the district court.  18 U.S.C. § 3582(c)(1)(A) (2018).  In this regard, the

20   FSA specifically provides that a court may

21               upon motion of the defendant after the defendant has fully exhausted
22               all administrative rights to appeal a failure of the [BOP] to bring a
                 motion on the defendant's behalf[2] or the lapse of 30 days from the
23               receipt of such a request by the warden of the defendant's facility,

---

24   [2]  If the BOP denies a defendant's request within 30 days of receipt of such a request, the
     defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the
25   date the Warden signed the response."  28 C.F.R. § 542.15(a).  If the Regional Director denies a
     defendant's administrative appeal, the defendant must appeal again to the BOP's "General
26   Counsel within 30 calendar days of the date the Regional Director signed."  *Id.*  "Appeal to the
     General Counsel is the final administrative appeal."  *Id.*  When the final administrative appeal is
27   resolved, a defendant has "fully exhausted all administrative rights."  *See* 18 U.S.C.
     § 3582(c)(1)(A).
28

whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that –

(i)   extraordinary and compelling reasons warrant such a reduction; or

(ii)  the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission [.]

18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[3]

/////

---

[3] Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), Pub. L. 116-136, expands the BOP's authority to release incarcerated defendants without judicial intervention. The CARES Act allows the BOP to "lengthen the maximum amount of time" for which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director determines appropriate," assuming "the Attorney General finds that emergency conditions will materially affect the functioning" of the BOP. CARES Act, Pub. L. 116-136, Div. B, Title II, § 12003(b)(2) (2020). However, the BOP's authority in this regard is limited to "the covered emergency period." *Id.* The BOP's authority expires "30 days after the date on which the national emergency declaration terminates." *Id.* § 12003(a)(2). After the CARES Act was enacted, the Attorney General issued a memo instructing the BOP to "immediately review all inmates who have COVID-19 risk factors" beginning with those who are housed at facilities where "COVID-19 is materially affecting operations." Office of Att'y Gen., *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020). The BOP has acted on the Attorney General's guidance, including one case in which a sentenced prisoner was released to home confinement after serving less than half his sentence from a facility that reported no positive COVID-19 cases at the time of his release. *See* Hannah Albarazi, *Paul Manafort Seeks Prison Release Over COVID-19 Fears*, LAW360 (Apr. 14, 2020), https://www.law360.com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid COVID-19 Fears*, LAW360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-manafort-released-from-prison-amid-covid-19-fears.

4

1        The applicable policy statement with respect to compassionate release in the U.S.

2    Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and

3    compelling reasons."  U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13[4]; *see also*

4    *United States v. Gonzalez*, 451 F. Supp. 3d 1194, 1197 (E.D. Wash. 2020) (noting that courts

5    "universally" rely on U.S.S.G. § 1B1.13 to define "extraordinary and compelling reasons," even

6    though that policy statement was issued before Congress passed the FSA and authorized

7    defendants to file compassionate release motions).  However, a large and growing number of

8    district courts across the country have concluded that because the Sentencing Commission has not

9    amended the Guidelines since the enactment of the FSA, courts are not limited by the pre-FSA

10   categories described in U.S.S.G. § 1B1.13 in assessing whether extraordinary and compelling

11   circumstances are presented justifying a reduction of sentence under 18 U.S.C. § 3582(c).  *See,*

12   *e.g.*, *United States v. Parker*, 461 F. Supp. 3d 966, 978–79 (C.D. Cal. 2020) (collecting cases);

13   *United States v. Rodriguez*, 424 F. Supp. 3d 674, 681 (N.D. Cal. 2019).

14       In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the

15   defendant bore the initial burden of demonstrating that a sentence reduction was warranted.  *See*

16   *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998).  Although the Ninth Circuit

17   has not specifically addressed the question of which party bears the burden in the context of a

18   motion for compassionate brought pursuant to § 3582(c) as amended by the FSA, district courts

19   that have done so have agreed that the burden remains with the defendant.  *See, e.g.*, *United*

20   *States v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020);

21   *United States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, at *3 (W.D. Wash. May 7,

22   2020).

23                              **ANALYSIS**

24       As district courts have summarized, in analyzing whether a defendant is entitled to

25   compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a

26

27   ──────────────
     [4]  The Sentencing Guidelines also require that to be granted a reduction of sentence under 18
     U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person
28   or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).

1    defendant has satisfied three requirements:

2              First, as a threshold matter, the statute requires defendants to exhaust
              administrative remedies.   18 U.S.C. § 3582(c)(1)(A).   Second, a
3              district court may grant compassionate release only if "extraordinary
              and compelling reasons warrant such a reduction" and "that such
4              reduction is consistent with applicable policy statements issued by
              the Sentencing Commission.  *Id.*  Third, the district court must also
5              consider "the factors set forth in Section 3553(a) to the extent that
              they are applicable."  *Id.*
6

7    *Rodriguez*, 424 F. Supp. 3d at 680; *see also United States v. Ramirez-Suarez*, 16-CR-00124-

8    LHK-4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *Parker*, 461 F. Supp. 3d at 973–74;

9    *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9,

10   2020) (noting that as to the third factor, under 18 U.S.C. § 3582(c)(1)(A) release must be

11   "consistent with" the sentencing factors set forth in §3553(a)).

12   **A.      Administrative Exhaustion**

13             On June 9, 2020, defendant submitted an administrative request to the facility

14   administrator at D. Ray James Correctional Institution ("CI DRJ")—where defendant was

15   incarcerated at that time—seeking an immigration hearing to have his "Public Safety Factor"

16   classification removed so he could be eligible for compassionate release.  (Doc. No. 117-1 at 6–

17   7.)  That request was denied on June 15, 2020.  (*Id.* at 5.)  The government submits additional

18   documentation demonstrating that defendant submitted an administrative request seeking his

19   compassionate release on June 11, 2020 and that the facility administrator at CI DRJ denied that

20   request a week later, on June 18, 2020.  (Doc. No. 123-1 at 8–9, 11.)  In that denial, the facility

21   administrator noted that defendant failed to provide "proposed released plans," including where

22   he would live, how he would support himself, and how he would receive and pay for medical

23   treatment.  (*Id.* at 11.)  The facility administrator stated that if defendant had "additional

24   information which could be considered extraordinary or compelling," any further request should

25   be submitted to the facility administrator's office.  (*Id.*)  On July 23, 2020, defendant's counsel

26   submitted an administrative request to the facility administrator at CI DRJ seeking defendant's

27   compassionate release.  (Doc. No. 117-1 at 10–11.)  As of the date that the pending motion for

28   compassionate release was filed, defendant represents that no response has been received to his

                                                          6

1   counsel's July 23, 2020 administrative request.  (Doc. No. 117 at 17.)

2          The court concludes that defendant has exhausted his administrative remedies, or in the

3   alternative, that defendant is excused from exhausting those administrative remedies.  First, the

4   government concedes that defendant has exhausted his administrative remedies.  (Doc. No. 123 at

5   4.)  Because a failure to exhaust administrative remedies where such is required is normally

6   viewed as an affirmative defense that must be pled and proven, the government's concession as to

7   exhaustion is dispositive of the issue.  Second, the court observes that defendant was and is

8   confined at a contracted, private prison facility, as opposed to a BOP facility.  *See, e.g.*, *United*

9   *States v. Jepsen*, 451 F. Supp. 3d 242, 245–46 (D. Conn. 2020) (concluding that exhaustion was

10  satisfied where defendant was housed at a privately operated facility because he was "essentially

11  caught in a 'Catch-22'; neither the warden . . . nor the BoP will consider his request because of

12  his designation to . . . a non-BOP facility"); *see also United States v. Rivera*, No. 2:17-CR-256

13  JCM, 2020 WL 5437725, at *3 n.4 (D. Nev. Sept. 10, 2020) (where the government conceded the

14  defendant was "not subject to the exhaustion requirement" because he was held in a private

15  facility); *United States v. Dimas*, No. 20-CR-365 DMS, 2020 WL 4697966, at *2 (S.D. Cal. Aug.

16  13, 2020) (government conceding that the defendant "met the exhaustion requirements" because

17  he was held in a private facility).  Here, it is unclear whether defendant can appeal any denial of

18  his request for compassionate release to the BOP's Regional Director and then the General

19  Counsel.  *See* note 2, above.  If not, defendant has exhausted all the administrative remedies that

20  are available to him.  For both of these reasons, the court concludes that administrative exhaustion

21  has been satisfied here and will turn to address the merits of defendant's pending motion below.

22  **B.     Extraordinary and Compelling Reasons**

23          "Extraordinary and compelling reasons" warranting compassionate release may exist

24  based on a defendant's medical conditions, age and other related factors, family circumstances, or

25  "other reasons."  U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D).  Even though the catch-all of "other

26  reasons" was included in the policy statement at a time when only BOP could bring a

27  compassionate release motion, courts have agreed that it may be relied upon by defendants

28  bringing their own motions under the FSA.  *See, e.g.*, *United States v. Kesoyan*, No. 2:15-cr-236-

1    JAM, 2020 WL 2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

2            Thus, the medical condition of a defendant may warrant compassionate release where he

3    or she "is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life

4    trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a

5    specific time period) is not required."  U.S.S.G. § 1B1.13, cmt. n.1 (A)(i).  Non-exhaustive

6    examples of terminal illnesses that may warrant a compassionate release "include metastatic

7    solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced

8    dementia."  *Id.*  In addition to terminal illnesses, a defendant's debilitating physical or mental

9    condition may warrant compassionate release, including when:

10           The defendant is

11           (I)   suffering from a serious physical or medical condition,

12           (II)  suffering from a serious functional or cognitive impairment, or

13           (III) experiencing deteriorating physical or mental health because of
             the aging process,

14

15           that substantially diminishes the ability of the defendant to provide
             self-care within the environment of a correctional facility and from
             which he or she is not expected to recover.

16

17   *Id.* at cmt. n.1 (A)(ii).  Where a defendant has moderate medical issues that otherwise might not

18   be sufficient to warrant compassionate release under ordinary circumstances, some courts have

19   concluded that the risks posed by COVID-19 tips the scale in favor of release in particular

20   situations.  *See, e.g.*, *United States v. Rodriguez*, 451 F. Supp. 3d 392, 405–06 (E.D. Pa. 2020)

21   ("Without the COVID-19 pandemic—an undeniably extraordinary event—Mr. Rodriguez's

22   health problems, proximity to his release date, and rehabilitation would not present extraordinary

23   and compelling reasons to reduce his sentence.  But taken together, they warrant reducing his

24   sentence.").

25           Compassionate release may also be warranted based on a defendant's age and other

26   related factors.  In these situations, "extraordinary and compelling reasons" exist where a

27   "defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or

28

1   mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of

2   his or her term of imprisonment, whichever is less."  U.S.S.G. § 1B1.13, cmt. n.1(B).[5]  In

3   determining a defendant's projected release date, courts may consider any "good time credits"

4   awarded to the defendant by BOP for "exemplary" behavior in prison as set forth in 18 U.S.C. §

5   3624(b)(1).  *See, e.g.*, *United States v. Burrill*, 445 F. Supp. 3d 22, 24 n.1 (N.D. Cal. Apr. 10,

6   2020).

7          Here, defendant Aguilar-Madriz argues that extraordinary and compelling reasons

8   warranting his compassionate release exist due to medical conditions.  To qualify for

9   compassionate release, defendant must demonstrate that he is suffering from some "serious"

10  medical condition "that substantially diminishes [his] ability . . . to provide self-care" in CI Big

11  Spring and the medical condition is one "from which he . . . is not expected to recover."  U.S.S.G.

12  § 1B1.13, cmt. n.1 (A)(ii).  More specifically here, defendant argues that his age of 63 years old,

13  type 2 diabetes, obesity, and hyperlipidemia (or high cholesterol)—combined with the risk posed

14  to him by COVID-19—justify his compassionate release.  (Doc. No. 117 at 18–20.)

15         At the time of defendant's sentencing, it was noted that he suffered from diabetes and pain

16  in his knees and feet, both of which required him to take medication.  (Doc. No. 77 (Presentence

17  Report) at 9 ("He reported no additional medical problems.").)  Moreover, defendant's height was

18  listed at 5'6" and his weight as 180 pounds in 2015.  (*Id.* at 3.)  Defendant's prison medical

19  records provide an up-to-date picture of his current condition.  Those records reflect that

20  defendant suffers from type 2 diabetes, hyperlipidemia, unspecified hypertension, and benign

21  prostatic hyperplasia (BPH), commonly known as an enlarged prostate gland.  (Doc. No. 121 at 7

22  (sealed).)  Further, at one point in 2019, defendant's blood glucose levels elevated to the point of

23  him requiring him to receive insulin injections on three consecutive days.  (*Id.* at 3; *see also* Doc.

24  No. 117 at 18 (erroneously arguing that this medical event occurred "[i]n May of [2020]").)  It

25  does not appear that defendant suffered any other events like the one in 2019 with respect to his

26  type 2 diabetes.  Defendant is prescribed 850 mg dosages of Metformin for that condition—and it

27

28  [5]  Because defendant Aguilar-Madriz is 63 years old, (*see* Doc. No. 77 (Presentence Report) at 3),
    these age and age-related factors are irrelevant to the court's disposition of the pending motion.

1    appears that he is instructed to take that medication three times a day, although the handwritten

2    medical notes submitted in support of the motion are difficult for the court to decipher.  (Doc.

3    Nos. 121 at 9 (sealed).)  Defendant is also prescribed several other medications, including

4    Lisinopril which the court understands is medication that is used to treat hypertension and/or high

5    blood pressure.  (*Id.*)  Additionally, defendant appears to be under chronic care for both his

6    hypertension and diabetes.  (*Id.* at 11.)  Defendant received two chronic care checkups in 2020

7    and both times the prison medical staff noted the level of "control" over his hypertension and

8    diabetes.  (*Id.*)  On February 26, 2020, defendant's hypertension was listed as "fair" and his

9    diabetes was listed as "good."  (*Id.*)  On July 2, 2020—well after the onset of the COVID-19

10   pandemic—it was noted that defendant's hypertension was "good" and his diabetes was also

11   "good."  (*Id.*)   Finally, in addition to his diabetes and hypertension, defendant has gained weight

12   since he began serving his prison sentence:  in July 2020 he weighed 200 pounds.  (*Id.* at 11.).

13   Therefore, because defendant's height is 5'6" (Doc. No. 77 (Presentence Report) at 3), his body

14   mass index (BMI) is 32.3 and he is considered to be medically obese.  *See Adult BMI Calculator*,

15   CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing

16   /bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last visited Jan. 5, 2021).

17           According to the U.S. Centers for Disease Control and Prevention ("CDC"), defendant is

18   at higher risk of severe illness were he to contract COVID-19 because of his BMI/obesity and his

19   type 2 diabetes.  *See Coronavirus Disease 2019 (COVID-19): People Who Are at Increased Risk*

20   *for Severe Illness*, CENTERS FOR DISEASE CONTROL AND PREVENTION,

21   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-

22   risk.html (last visited Jan. 5, 2021).  Because it appears that defendant suffers from essential

23   hypertension (and not pulmonary hypertension), a point not disputed by the parties, he "might" be

24   at higher risk of severe illness from COVID-19 because of that condition.[6]  *Id.*  Last, defendant is

25   at some higher risk due to his age as well, but that relative risk is compared to younger

26   individuals:  "Older adults are at greater risk of requiring hospitalization or dying if they are

27   _____

28   [6]  While the CDC does not recognize high cholesterol as an at-risk category for COVID-19, that
     condition is discussed generally under the hypertension and/or high blood pressure category.

10

1  diagnosed with COVID-19." *Id.* (stating that 50 to 64-year-old individuals who contract COVID-

2  19 are four times more likely to require hospitalization and 30 times more likely to die compared

3  to 18 to 29-year-old individuals).  Thus, defendant suffers from several comorbidities placing him

4  at greater risk of suffering a severe illness if he were to contract COVID-19.  As the CDC

5  recognizes, "[t]he more underlying medical conditions someone has, the greater their risk is for

6  severe illness from COVID-19." *Id.*

7        The potential risk to defendant from COVID-19 must be assessed in light of the current

8  medical evidence before the court.  On July 19, 2020, it was documented by prison medical staff

9  that defendant displayed, for at least four days, several "influenza-like" symptoms, including a

10  temperature above 100 degrees, a cough, a headache, and wheezing in the lungs.  (Doc. No. 121

11  at 18 (sealed).)  As a result, defendant was recommended to be placed in a "one man cell[.]"  (*Id.*)

12  The following day, defendant received chest x-rays revealing some abnormal density in his right

13  lung, which was noted by medical staff as being consistent with pneumonia.  (*Id.* at 41–43.)  The

14  prison medical records before the court reflect that a test was administered to defendant on that

15  same date (July 20, 2020) and two days later (July 22, 2020) the results of that test appear to

16  reflect that defendant tested positive for COVID-19.  (*Id.* at 36.)[7]  Then, about two weeks later, on

17  August 7, 2020, it appears defendant tested negative for COVID-19.  (*Id.* at 35.)[8]  The only other

18  meaningful medical documentation before the court, dated after August 7, 2020, with respect to

19  defendant's current condition is a record reflecting that his body temperature was recorded to be

20  98.5 degrees, or normal, in mid-October 2020.  (Doc. No. 128 at 9 (sealed).)  Other than that, the

21  ───────────────

[7]  The reason the court says that this "appears" to be the case is that the medical records are not
22  completely clear to the court and the parties have not focused in their briefing on whether or not
defendant Aguilar-Madriz tested positive for the virus while serving his term of imprisonment.
23  Specifically, at the cited page of the medical records a LabCorp report reflecting test for COVID-
19 administered to defendant on July 20, 2020 reports the:  result as "Detected;" the "Flag" as
24  "Abnormal;" and the "Reference Interval" as "Not Detected."  (Doc. No. 121 at 36 (sealed).)
Based upon that report the court is presuming that the test of defendant was positive for the virus.
25
26  [8]  The LabCorp report for the COVID-19 test administered on August 3, 2020 with the results
reported August 7, 2020, indicates as follows:  result as "Not Detected;" no entry under "Flag;"
27  and the "Reference Interval" as "Not Detected."  (Doc. No. 121 at 35 (sealed).)  Based upon that
report the court is presuming that the test administered to the defendant in August 2020 indicated
28  he was no longer positive for the virus.

1 court is not able to locate—nor do the parties cite—any medical evidence regarding defendant's

2 medical condition after August 2020.  Nonetheless, it does appear that defendant continues to

3 receive care since his latest COVID-19 negative test result in August 2020, and nothing in those

4 medical records suggests that his condition has worsened or that he failed to recover from his

5 virus related symptoms which appeared in mid-July 2020.  (*See id.* at 9–10 (preventative health

6 risk assessment dated September 2020 and influenza vaccine form dated October 2020).)  If

7 anything, the most recent medical evidence suggests that defendant is doing relatively well.

8   Although not stated as such in the pending motion or in his reply brief, defendant

9 essentially moves for compassionate release based on the possibility of reinfection because it

10 appears that he tested positive for COVID-19 in July 2020.  In this regard, many courts have

11 "err[ed] on the side of caution to avoid potentially lethal consequences" because "the science is

12 unclear on whether reinfection is possible."  *United States v. Yellin*, No. 3:15-cr-3181-BTM-1,

13 2020 WL 3488738, at *13 (S.D. Cal. June 26, 2020) (finding extraordinary and compelling

14 reasons exist where a COVID-positive inmate at FCI Terminal Island, who did not develop severe

15 symptoms, suffered from a combination of medical conditions that placed him at risk of serious

16 complications from COVID); *see also United States v. Hanson*, 470 F. Supp. 3d 1197, 1202 (D.

17 Or. 2020) ("[T]here is no current scientific evidence to indicate that a 'recovered' COVID-19

18 patient is immune from reinfection, as several courts have recently acknowledged. . . . [T]he

19 Court remains concerned about FCI Terminal Island's ability to provide adequate care in light of

20 defendant's complex medical needs.  The Court is not convinced that FCI Terminal Island has

21 been successfully mitigating the risk of reinfection, given the high numbers of infected inmates

22 and Defendant's own contraction of the virus.").  Other courts have taken the position that

23 uncertainty surrounding the danger of reinfection "cuts against compassionate release," in part

24 because it is the defendant's burden to establish that "extraordinary and compelling reasons"

25 justifying compassionate release exist.  *See United States v. Molley*, No. CR15-0254-JCC, 2020

26 WL 3498482, at *3 (W.D. Wash. June 29, 2020).

27   Because of his age, type 2 diabetes, obesity, and hypertension, combined with the risk of

28 reinfection from COVID-19, the court concludes that defendant has and is "suffering from a

12

1    serious physical or medical condition . . . from which he . . . is not expected to recover." *See*

2    U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii).  Even so, the remaining question is whether defendant

3    Aguilar-Madriz's medical conditions "substantially diminish[] [his] ability . . . to provide self-

4    care" at CI Big Spring.  *See id.*

5        Based on the current evidence of record before the court, defendant has not carried his

6    burden of demonstrating that he is significantly hindered in providing himself with care while

7    incarcerated.  *See Greenhut*, 2020 WL 509385, at *1 ("The defendant bears the initial burden to

8    put forward evidence that establishes an entitlement to a sentence reduction.").  It appears that

9    defendant likely suffered a moderate illness from COVID-19, even though the prison medical

10   staff initially noted only that he suffered from "influenza-like" symptoms prior to his positive

11   COVID-19 test results.  The court does not find that defendant merely had pneumonia, given that

12   he tested positive for COVID-19 less than a week after the onset of his symptoms.  (*See* Doc. No.

13   121 at 41–43 (sealed).)  Rather, the court will assume that, as indicated by the test results, that

14   defendant did in fact suffer from COVID-19 in July of 2020.  Nonetheless, the dearth of medical

15   evidence dated after defendant's second COVID-19 test on August 7, 2020—which came back

16   negative—indicates that he appears to have recovered from the virus.  (Doc. No. 128 at 9 (sealed:

17   listing a normal body temperature).)  The evidence before the court simply does not show that

18   defendant is in severe physical condition or otherwise experiencing a deterioration in health.  *See*

19   *United States v. McCollough*, No. 15-cr-00336-001-PHX-DLR, 2020 WL 2812841, at *2 (D.

20   Ariz. May 29, 2020) ("Since Defendant has contracted COVID-19, the relevant questions concern

21   (1) the course of his illness, (2) the state of his health, (3) his prognosis, and (4) the adequacy of

22   the care and treatment being provided to him in BOP given his pre-existing conditions. . . . There

23   is no evidence that the circumstances surrounding Defendant's health or treatment are

24   extraordinary or compelling.").

25       Further, defendant was receiving medical care at his prior institution of confinement (CI

26   DRJ), although the court recognizes that he was transferred to a different prison sometime after

27   this motion was filed—and that there are no medical records from his new prison of confinement

28   (CI Big Spring) submitted in connection with the pending motion.  Nonetheless, based upon the

1   record before the court, defendant's chronic conditions appear to be well-managed by prison

2   medical staff. *See United States v. Ayon-Nunez*, No. 1:16-cr-00130-DAD, 2020 WL 704785, at

3   *3 (E.D. Cal. Feb. 12, 2020) ("Chronic conditions that can be managed in prison are not a

4   sufficient basis for compassionate release.").  Finally, according to the BOP, CI Big Spring is

5   currently reporting 18 active cases of COVID-19 among inmates and zero active cases among

6   staff.[9]  *See COVID-19*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last

7   visited Jan. 9, 2021) (use geographical map to select CI Big Spring).[10]  Accordingly, in this case,

8   the active COVID-19 cases at CI Big Spring do not tip the scales in favor of defendant's release

9   because the presence of the virus appears relatively controlled at this point and defendant has

10   already contracted the virus and recovered from it.[11]  In certain situations, an inmate's inability to

11   take proper precautions against contracting COVID-19 might be relevant to a determination of his

12   or her ability to provide self-care for purposes of assessing whether compassionate release is

13   appropriate.  *See United States v. Gorai*, No. 2:18-cr-00220-JCM, 2020 WL 1975372, at *3 (D.

14   Nev. April 24, 2020) ("the presence of COVID-19 . . . necessitates a more expansive

15   interpretation of what self-care means" and therefore, the inability of individuals at high risk of

16   becoming severely ill from COVID-19 to practice appropriate hygiene, wear a mask, and

17   maintain social distancing may constitute an inability to provide self-care under some

18   circumstances).  But here, defendant has not presented any evidence to indicating that CI Big

19

20   [9]  While the undersigned does not necessarily accept these reported numbers at face value in light
21   of current CDC guidelines with respect to both testing and the manner of counting "active cases,"
     there is also no evidence before the court challenging those reported numbers in this case.

22   [10]  CI Big Spring has a total population of 1,395 inmates.  *CI Big Spring*, FEDERAL BUREAU OF
23   PRISONS, https://www.bop.gov/locations/ci/bsc/ (last visited Jan. 5, 2021).  Moreover, CI Big
     Spring should not be confused with the BOP's own Big Spring Federal Correctional Institution
24   located in the same city, which previously suffered from a significant COVID-19 outbreak.

25   [11]  The undersigned has recognized that, in certain circumstances, extraordinary and compelling
26   reasons may exist even where a particular facility is not reporting any positive COVID-19 cases,
     but only if the inmate's medical condition is extremely severe.  *See United States v. Heffington*,
27   No. 1:93-cr-05021-NONE, 2020 WL 4476485, at *7 (E.D. Cal. Aug. 4, 2020) (collecting cases).
     However, the court declines to make such a finding here because defendant Aguilar-Madriz's
28   medical condition, while serious, is not extremely severe at the moment.

14

1    Spring has failed to take measures to reduce the spread of the virus or that the conditions of his

2    confinement make it impossible for him to adequately maintain social distancing.

3            While there is still some unknown risk to defendant due to the possibility that he could be

4    re-infected with COVID-19 and contract a severe illness as a result, that speculative possibility by

5    itself does not provide an adequate basis upon which the court could conclude that defendant is

6    currently "substantially diminish[d]" in "provid[ing] self-care" inside CI Big Spring. *See*

7    U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii). Therefore, in this case, the court does not find extraordinary

8    and compelling reasons justifying compassionate release pursuant to § 3582(c)(1)(A).

9            It is defendant's burden to demonstrate that he satisfies the standard as set forth by the

10   relevant policy statement under the U.S. Sentencing Guidelines. Here, there is no doubt that

11   defendant suffers from serious comorbidities that put him at greater risk of suffering a severe

12   illness from COVID-19 (even though he has already tested positive for the virus and apparently

13   was fortunate enough to display only moderate symptoms). However, extraordinary and

14   compelling reasons do not exist based upon the present record to warrant defendant's release.

15   **C.    Consistency With the § 3553(a) Factors**

16           Because the pending motion fails to establish extraordinary and compelling reasons

17   justifying compassionate release in this case, the court need not address whether any reduction in

18   defendant's sentence would be consistent with consideration of the sentencing factors set forth at

19   18 U.S.C. § 3553(a).[12] Nonetheless, the court does note that defendant Aguilar-Madriz has

20   served over 85 months in prison, or approximately 83% of his total sentence accounting for good

21   _____

22   [12] Title 18 U.S.C. § 3553(a) provides that, in determining the sentence to be imposed, the court
     shall consider: the nature and circumstances of the offense and the history and characteristics of

23   the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote
     respect for the law, provide just punishment for the offense, afford adequate deterrence, protect

24   the public from further crimes of the defendant and provide the defendant with needed
     educational or vocational training, medical care, or other correctional treatment in the most

25   effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range
     established for the applicable category of offense committed by the applicable category of

26   defendant as set forth in the guidelines; any pertinent policy statement issued by the Sentencing

27   Commission; the need to avoid unwarranted sentence disparities among defendants with similar
     records who have been found guilty of similar conduct; and the need to provide restitution to any

28   victims of the offense.

                                                      15

1  time credits.  (Doc. No. 123-1 at 4.)  Defendant had no criminal record prior to his conviction in

2  this case.  (Doc. No. 77 (Presentence Report) at 8.)  Defendant's sole disciplinary infraction while

3  in prison is not particularly serious, and certainly not so serious as to deny his release based on

4  consideration of that fact alone.  (Doc. No. 129 at 8 (arguing that defendant borrowed a fellow

5  prisoner's cell phone to call his family).)  On the other hand, defendant's offense conduct in this

6  case was extremely serious and involved the distribution of a substantial amount of controlled

7  substances.  In addition, he involved his minor son in his drug trafficking criminal conduct and

8  nonetheless received a below guideline sentence.  Were defendant to establish extraordinary and

9  compelling reasons justifying his compassionate release based on medical necessity, the question

10  of whether consideration of § 3553(a)'s sentencing factors would support a sentence reduction

11  despite the seriousness of his underlying offense conduct would be a close question.

12                                                   **CONCLUSION**

13         For the reasons explained above, the court concludes that defendant has not demonstrated

14  that "extraordinary and compelling reasons" exist warranting his compassionate release from

15  prison.  Accordingly, defendant's motion for compassionate release (Doc. No. 117) is denied.

16  IT IS SO ORDERED.

17    Dated:   __**January 11, 2021**__              _____

18                                                              UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28

                                                      16